IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

KEVIN CHRISTOPHER HANDSAKER,    §
Institutional ID No. 04866423,    §
                                  §
                Plaintiff,        §
                                  §
v.                                §    CIVIL ACTION NO. 5:19-CV-200-BQ
                                  §
TEXAS CIVIL COMMITMENT CENTER,    §
                                  §
                Defendant.        §

**REPORT AND RECOMMENDATION**

Proceeding pro se and *in forma pauperis*, Plaintiff Kevin Christopher Handsaker filed this civil rights action under 42 U.S.C. § 1983. The United States District Court transferred the case to the undersigned United States Magistrate Judge for further proceedings. ECF No. 5. Handsaker has not consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned enters this Report and recommends that this action be dismissed under 28 U.S.C. § 1915(e)(2)(B).

## I.    Background

Handsaker was tried and civilly adjudged to be a sexually violent predator (SVP), as defined by Texas Health & Safety Code § 841.003. Upon his release from the Texas Department of Criminal Justice (TDCJ) after completing his criminal sentence, the State of Texas transferred Handsaker to the Bill Clayton Detention Center in Littlefield, Texas,[1] where he remains confined

---

[1] The Bill Clayton Detention Center is also known as the Texas Civil Commitment Center (TCCC). TCCC is apparently currently operated by Management & Training Corporation (MTC), a private company under contract with the Texas Civil Commitment Office (TCCO). TCCC was previously operated by Correct Care Recovery Solutions (CCRS).

1

for inpatient treatment in accordance with the provisions of Texas Health & Safety Code § 841.081.

Handsaker is confined pursuant to an order of civil commitment; therefore, he is not considered a "prisoner" within the meaning of 28 U.S.C. § 1915(h) and is not subject to the screening procedures of 28 U.S.C. § 1915A. *See Bohannan v. Doe*, 527 F. App'x 283, 289–90 (5th Cir. 2013) (concluding that a civilly committed SVP was not a prisoner within the meaning of the Prison Litigation Reform Act); *Michau v. Charleston Cty.*, 434 F.3d 725, 727 (4th Cir. 2006) (same); *Allen v. Seiler*, No. 4:12–CV–414–Y, 2013 WL 357614, at *1 n.1 (N.D. Tex. Jan. 30, 2013), *aff'd*, 535 F. App'x 423, 423 (5th Cir. July 12, 2013) (per curiam) (citing *Jackson v. Johnson*, 475 F.3d 261, 266 (5th Cir. 2007)) (same). Because Handsaker is proceeding *in forma pauperis*, however, he is nevertheless subject to the screening provisions of 28 U.S.C. § 1915(e)(2)(B). Accordingly, the Court reviewed Handsaker's Complaint and entered an order directing Handsaker to complete a questionnaire in accordance with *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976) to further develop his allegations. Handsaker timely completed and returned the questionnaire. ECF No. 15. After reviewing Handsaker's responses to the first questionnaire, the Court needed additional factual development from Handsaker concerning his claims. The Court therefore directed Handsaker to complete a supplemental questionnaire, which he has returned. ECF Nos. 16, 17.

## II.    **Standard of Review**

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002)

2

(affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327. When analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical or other prison records if they are adequately identified and authenticated").

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378 (5th Cir. 2002)).

### III.    Discussion

In his Complaint, Handsaker did not name any specific defendants. *See* ECF No. 1. In his questionnaire responses, however, Handsaker identified the following Defendants: (1) Marsha McLane, Executive Director of TCCO; (2) Timothy J. Proctor, Ph.D, ABPP forensic psychologist; (3) Judge McCorricle, 300th Judicial District, Brazoria County, Texas; (4) Rebecca L. Bauer,

3

Ph.D; (5) Maureen Whittmore, Special Prosecution Unit—Civil Division; (6) Natalie Broaddus-Brazoria, County Assistant District Attorney; (7) Captain Demel, MTC; (8) Officer Fisher, MTC; (9) Officer Mosley, MTC; (10) Rachel Kingston, TCCO lead case manager; (11) Amanda Beltran, TCCO case manager; (12) Cris Salinas, TCCO case manager; (13) Leslie C. Morey, Ph.D, psychologist; (14) Joseph BonJorno, manager; (15) Property Officer Portillo; (16) Officer Wellman, MTC; (17) Officer Flores, MTC; (18) Officer Lemer, MTC; (19) Officer Virquez, MTC; (20) Sergeant Thomas, MTC; (21) Laura Locke, former therapist; (22) Kristina Luera, lead clinical therapist; (23) Aaron Pierce, Chief of Security; (24) J. Cochran; (25) W. Schmoker; (26) Greg Shirley; (27) Amy Delon Curtis; (28) Kara Gouglar; (29) Michael Searcy, special operations; (30) Captain Cruz; (31) Captain Rodriguez; (32) Officer Flores; (33) Sergeant Orneals; (34) John Cochran, facility director; (35) A. Jordan, EMT; (36) Valarie Velazquez, RN; and (37) Debra Keesee, RN. Questionnaire 1, 3, 4, 5, 7, 8, 9 ECF No. 15 [hereinafter Questionnaire I].

In general, Handsaker's Complaint and questionnaire responses are vague and lack specific factual support. Handsaker generally alleges that Defendants have kidnapped, imprisoned, and held him against his will. Compl. 1; Questionnaire I 1. Although unclear, Handsaker appears to take issue with his civil confinement, equating it to kidnapping and imprisonment. *See* Questionnaire I 1–2. Handsaker further asserts that on May 8, July 12, July 27, and November 15, 2019, Defendants "illegally searched" his dormitory. Compl. 1; Questionnaire I 3. Handsaker also contends Defendants have prevented him from making phone calls to his family and attorney, denied him access to the courts, inhibited his freedom of speech, and failed to provide adequate medical treatment. Questionnaire I 4–5, 7–10. In addition, Handsaker asserts that Defendants have retaliated against him and unlawfully placed him in "solitary confinement." Compl. 1; Questionnaire I 11–13. Finally, Handsaker claims that Defendants have denied him the ability to

4

practice his Native American religion (Questionnaire I 5–7) and that unnamed persons have verbally harassed him. Compl. 1. Handsaker seeks monetary damages, release from the TCCC, and extradition back to Oregon as a result of these alleged constitutional violations. Questionnaire I 13. The Court addresses each claim in turn.

A.    **Handsaker's request for relief in the form of release from the TCCC and extradition to Oregon are not remedies available under 42 U.S.C. § 1983.**

Because Handsaker did not specify the type of relief sought in his Complaint, the Court asked Handsaker in its questionnaire to specify what he wanted the Court to do. *Id.* at 13. Handsaker responded that he would like "[r]elease from Texas Civil Commitment, [and] extradi[tion] back to the state of Oregon," as well as an award of monetary damages. To the extent Handsaker challenges the fact or duration of his commitment, he must file a petition for writ of habeas corpus. *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005); *see, e.g.*, *Banda v. N.J. Dep't of Mental Health Servs.*, No. Civ.A. 05–2622(WJM), 2005 WL 2129296, at *3 (D.N.J. Aug. 31, 2005) ("Thus, [SVP] can challenge the fact of his involuntary commitment, as opposed to the conditions of his confinement, only by petitioning for a writ of habeas corpus and after exhausting his state court remedies as required by 28 U.S.C. § 2254.").

B.    **Handsaker's challenge to his civil commitment does not give rise to a cognizable § 1983 claim.**

Handsaker asserts that on October 17, 2018, a state court civilly committed him, and that Defendants kidnapped and "imprisoned" him to the TCCC May 8, 2019. Questionnaire I 1. According to Handsaker, Defendants told him that he would be living in a "residential . . . treatment facility," but the TCCC is in actuality more like a prison than a treatment facility because it has "chain linked fences, razor wire, camera's [sic], motion detectors, and . . . security guards." Compl. 1; Questionnaire I 2. Handsaker believes he should be allowed to have a job and "go into

5

the community to go shopping and/or out to eat with [his] family." Compl. 1. He alleges that his confinement violates "all" his constitutional rights. Questionnaire I 2. Regardless of how Handsaker characterizes his claim, he essentially challenges his civil commitment's legality, as illustrated by the relief he seeks—release. To the extent Handsaker attempts to attack the legal validity of his civil commitment, i.e., the terms of his commitment order or final judgment, such claims are not cognizable under 42 U.S.C. § 1983.

### 1.    *Handsaker has not demonstrated satisfaction of* Heck v. Humphrey's *requirements prior to challenging the validity of his civil commitment.*

In *Heck v. Humphrey*, the United States Supreme Court held that a plaintiff seeking to recover damages for harm "caused by actions whose unlawfulness would render a conviction or sentence invalid" must first prove that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994). Where a favorable judgment in the civil rights action would "necessarily imply the invalidity of [a prisoner's] conviction or sentence" in his criminal case, the civil claim is barred unless the criminal conviction has been reversed or otherwise declared invalid. *Id.* Courts have subsequently applied *Heck*'s principles to prisoners' claims for injunctive and declaratory relief, as well as disciplinary convictions. *See, e.g.*, *Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (applying *Heck* to prisoner's claim that disciplinary charge violated his due process rights and concluding claim was not cognizable under § 1983); *Reger v. Walker*, 312 F. App'x 624, 625 (5th Cir. 2009) (noting that whether a plaintiff's claims are "for damages, declaratory judgment, or injunctive relief," they are not cognizable under § 1983 until plaintiff's conviction is overturned or otherwise declared invalid).

6

Although *Heck* dealt with criminal incarceration (as opposed to civil commitment, as in the case at hand), federal courts have similarly applied the *Heck* bar to § 1983 claims challenging civil commitments. *See, e.g., Allen*, 2013 WL 357614, at *2–3 (dismissing some of SVP's claims as *Heck* barred and compiling cases holding same); *see also Huftile v. Miccio-Fonseca*, 410 F.3d 1136, 1140 (9th Cir. 2005) (noting that *Heck* applies to civilly committed persons as well as prisoners); *Black v. Turner*, No. 5:17-CV-111-C, slip. op. at 3–4 (N.D. Tex. Sept. 7, 2017) (citing *Allen*, 2013 WL 357614, at *2–3). Here, Handsaker has not demonstrated that he has satisfied *Heck*'s criteria—i.e., he remains committed at TCCC and has not shown that such commitment has been invalidated or otherwise reversed by a state or federal court. Thus, any claims attacking the validity or enforceability of his civil commitment must be dismissed. *Heck*, 512 U.S. at 486–87; *Allen*, 2013 WL 357614, at *2–3.

### 2.    *Handsaker's claims are barred by the* Rooker-Feldman *doctrine.*

Alternatively, Handsaker's claims are barred by the *Rooker-Feldman* doctrine and must be dismissed. Handsaker alleges that he is confined against his will at the TCCC, as opposed to a live-in treatment facility. Questionnaire I 2. Handsaker's claim, properly framed, attempts to collaterally attack through this federal § 1983 action the state court's civil commitment judgment.

The Supreme Court has held that federal district courts lack subject matter jurisdiction over actions in which a plaintiff challenges a state court judgment. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 486 (1983) (citing 28 U.S.C. § 1257); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 416 (1923). Known as the *Rooker-Feldman* doctrine, federal district courts cannot "hear 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Brown v. Taylor*, 677 F. App'x 924, 927 (5th Cir. 2017) (quoting

*Exxon Mobil Corp. v. Saudi Basics Indus. Corp.*, 544 U.S. 280, 291 (2005)).  "To determine if *Rooker-Feldman* applies, courts look to the source of the federal plaintiff's alleged injury and what the federal court is being asked to review and reject." *Id.* (citing *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 381 (5th Cir. 2013)).  Where a federal district court must "review and reject the state court's decision," or where the plaintiff's claims are "inextricably intertwined with a state court judgment," federal court review of the state court judgment is barred.  *Id.* (internal quotations and citations omitted).

Here, Handsaker's claims are inextricably intertwined with the state court order and judgment civilly committing him.  Handsaker claims that Defendants kidnapped him, forcing him to reside in a prison-like setting as opposed to live-in residential treatment.  Questionnaire I 2.  Thus, this Court must necessarily "review and reject" the state court order committing Handsaker to properly determine Handsaker's claim that he is being held against his will at the TCCC.  *See Brown*, 677 F. App'x at 927.

The Court acknowledges that *Rooker-Feldman* is a narrow doctrine.  *See, e.g.*, *id.* (noting that the Supreme Court has found jurisdiction precluded by *Rooker-Feldman* only twice).  In *Brown v. Taylor*, for example, the Fifth Circuit reversed the district court, and concluded that an SVP's claims were not barred by *Rooker-Feldman* because the claims challenged Defendants' specific actions and the legislative basis for such conduct—not the underlying state civil commitment order.  *Id.* at 927–29.  Unlike in *Brown*, however, Handsaker's claims directly challenge the civil commitment order and require its review.  *Cf. id.*; *Hitt v. McLane*, A-17-CV-289-SS, 2018 WL 773992, at *11–12 & n.8 (W.D. Tex. Feb. 7, 2018), *R. & R. adopted by* 2018 WL 1326507 (W.D. Tex. Mar. 15, 2018) (finding *Rooker-Feldman* doctrine did not bar SVP's claims because court did "not read [SVP's] suit as attempting" to challenge the state commitment

8

orders). Handsaker in effect seeks review of a state court decision, something this Court cannot do. *See, e.g., Black*, No. 5:17-CV-111-C, slip. op. at 4–6 (citing *Liedtke v. State Bar of Tex.*, 18 F.3d 315, 317 (5th Cir. 1994)) (concluding that SVP's claim he was confined based on allegedly false information in an expert witness report was barred by the *Rooker-Feldman* doctrine); *Richards v. Taylor*, Civil Action No. H–13–1394, 2015 WL 5310853, at *6–7 (S.D. Tex. Sept. 11, 2015) (concluding SVP's claim challenging his place of confinement was inextricably intertwined with the state civil commitment order and thus barred by the *Rooker-Feldman* doctrine); *Barbee v. Taylor*, Civil Action No. H–14–714, 2015 WL 5316783, at *2 (S.D. Tex. Sept. 11, 2015) (same).

Despite being given the opportunity through his responses to the Court's questionnaire to expound upon the vague and conclusory allegations in his Complaint, Handsaker's allegations amount to nothing more than dissatisfaction with, and a challenge to, the state civil commitment order and judgment.[2] Accordingly, the undersigned recommends that the District Court dismiss Handsaker's claim challenging his commitment until the conditions of *Heck* are met. Alternatively, the undersigned recommends the District Court dismiss Handsaker's claim under *Rooker-Feldman* due to a lack of subject matter jurisdiction.

### C.    Handsaker has not pleaded adequate facts demonstrating Defendants "illegally" searched him in violation of his constitutional rights.

Handsaker alleges that on May 8, July 12, July 27, and November 15, 2019, Defendants "illegally searched" him "without a search warrant," invading his privacy. Questionnaire I 3. Other than claiming that Defendants searched and read his legal work, Handsaker provides no specific facts as to the searches—e.g., what Defendants searched, where the searches took place,

---

[2] To the extent Handsaker complains that unnamed persons have required him to submit to penile plethysmograph (PPG) tests (Compl. 1), the Court finds his claim is also barred by *Heck* and the *Rooker-Feldman* doctrine. Handsaker has not pleaded any facts showing that the PPG tests are anything other than a requirement of his civil commitment order. As such, the Court cannot review such a challenge. *See, e.g., Barbee*, 2015 WL 5316783, at *2.

the facts giving rise to the searches, etc. *See id.* Moreover, Handsaker does not state that he

suffered any harm as a result of the alleged unlawful searches; he merely avers that Defendants

"invad[ed] in [his] privacy, . . . breaching [his] confidentiality and [his] safety." *Id.*

The Fifth Circuit has not addressed the applicable standard for analyzing an SVP's illegal

search claim. Within the context of pretrial detainees, however, the Supreme Court has held that

"irregular or random 'shakedown' searches of the cells of detainees while the detainees are away

at meals, recreation, or other activities" do not violate the Fourth Amendment. *Block v. Rutherford*,

468 U.S. 576, 589–90 (1984). The Court reasoned that security concerns justify the searches,

which are "a matter lodged in the sound discretion of the institutional officials." *Id.* at 591. In

sum, "proper deference to the informed discretion of prison authorities demands that they, and not

the courts, make the difficult judgments which reconcile conflicting claims affecting the security

of the institution, the welfare of the prison staff, and the property rights of the detainees." *Id.*

(quoting *Bell v. Wolfish*, 441 US. 520, 557 n.38 (1979)); *see also Hudson v. Palmer*, 468 U.S. 517,

526 (1984) (holding that prisoners do not have a legitimate expectation of privacy in their cells,

therefore "the Fourth Amendment proscription against unreasonable searches does not apply

within the confines of the prison cell").

Here, Handsaker pleads no facts suggesting that the purported "illegal" searches were

anything other than TCCC officials conducting random searches to ensure safety and compliance

with facility rules. *See* Compl. 1; Questionnaire I 3. Handsaker apparently believes that TCCC

officials need a "search warrant signed off by a judge" before conducting a search of his property.

Questionnaire I 3. As a resident at a state commitment facility, however, Handsaker is not entitled

to the same protections as a person in the free world. *See Block*, 468 U.S. at 591; *Hudson*, 468

U.S. at 526. The undersigned therefore recommends that the District Judge dismiss Handsaker's

Fourth Amendment claim. *See, e.g.*, *Aruanno v. Allen*, Civil No. 09–1250 (SRC), 2011 WL 2161351, at *7 (D.N.J. May 31, 2011) (dismissing SVP's claim that officials strip searched him on one occasion because "detention facilities are fraught with serious security dangers, [thus,] it is established that routine or random strip searches of detained persons do not violate the Fourth Amendment"); *Carter v. Chamberlin*, No. 4:06CV01466 ERW, 2007 WL 2863781, at *2 (E.D. Mo. Sept. 25, 2007) (rejecting SVP's claim that pat-down search violated the Fourth Amendment, where SVP failed to demonstrate the search was unreasonable and facility had a "legitimate interest in maintaining order and protecting against physical danger"—an "interest [that] is promoted through pat-down searches").

> **D.    Handsaker has not stated a viable First Amendment claim based on the denial of phone calls or a general denial of free speech.**

Handsaker raises two separate First Amendment claims. First, Handsaker alleges that on two occasions, Defendants denied him the ability to call his family. Questionnaire I 4. Handsaker apparently did not have the money to make the calls, but believes he should be "allowed to have contact with anyone" because he is "a civilian." *Id.* He further asserts that Defendants have continuously denied him the right to free speech since he arrived at the TCCC. *Id.* at 8–9. Handsaker does not specify how Defendants limited his speech, making only the conclusory allegation that Defendants "threatened [him] with disciplinary action for exercising [his] 1st Amendment right." *Id.* at 8.

Civilly committed persons retain First Amendment rights; however, restrictions on such rights "are permissible so long as they advance the state's interest in security, order, and rehabilitation." *Bohannan*, 527 F. App'x at 294; *see Hargrove v. Santiago*, Civ. No. 2:14-4754 (WJM), 2017 WL 2869504, at *5 (D.N.J. July 5, 2017) (internal quotation marks omitted)

11

("Correctional facilities have broad discretion to restrict telephone access, but they must do so in a way that is reasonably related to a legitimate governmental objective."). As a result, civilly committed persons "are not entitled to the full panoply of First Amendment rights enjoyed by citizens free from restraint." *Salerno v. Corzine*, Civil Case Nos. 06–3547, 07–2751, 2013 WL 5505741, at *6 (D.N.J. Oct. 1, 2013), *aff'd*, 577 F. App'x 123 (3d Cir. 2014).

### 1. Use of the telephone

The Court does not read Handsaker's pleadings as alleging that Defendants completely denied Handsaker access to the phone. Instead, he contends that Defendants required him to pay for use of the phone, and on two occasions he did not have the money to pay for such calls.[3] Questionnaire I 4. Institutions "have a legitimate interest in defraying the costs incurred in housing and caring for" civilly committed persons. *See Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (explaining that when a "secure treatment facility" requires civilly committed persons to work, "it is to offset some of the cost of keeping them . . ."); *see also Ward v. Gloor*, Civil Action No. V–14–0036, 2014 WL 2949454, at *2 (S.D. Tex. June 30, 2014) (citing *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 253–54 (4th Cir. 2005)) (explaining that "inmates do not have a constitutional right to healthcare without incurring any financial indebtedness, even if they are

---

[3] In response to the Court's question asking Handsaker whether he had made any phone calls since arriving at the TCCC, Handsaker did not answer the question but responded: "When I arrived on May 8th 2019, Ms. Cris Salinas refused me to contact my family. Which took almost 8 months to get them approved, and TCCO's policy states it's only to take 14 days to approve." Questionnaire 5. To the extent Handsaker alleges TCCC officials took longer than the fourteen days allotted for approving family contacts, he has likewise failed to state a claim. First, violations of institutional policies do not give rise to cognizable constitutional claims. *See Richardson v. Thornton*, 299 F. App'x 461, 463 (5th Cir. 2008) ("The failure of the prison to follow its own policies . . . is not sufficient to make out a civil rights claim."). Second, any alleged delay basically constitutes a claim for negligence, which is not actionable under § 1983. *See, e.g.*, *Wright v. Pennington*, 176 F. App'x 579, 580 (5th Cir. 2006) ("Negligent conduct is not actionable under 42 U.S.C. § 1983."). Handsaker pleads no facts indicating that the delay was intentional. Questionnaire I 5. Finally, the Court notes that the authenticated records reflect that Handsaker did not have phone numbers to contact his family. He filed a grievance in September 2019 asking officials if he could use Facebook to search for family members so that he could obtain their phone numbers. Thus, it does not appear that the delay is entirely related to the conduct of TCCC officials, but was also the result of Handsaker's failure to provide accurate phone numbers.

indigent, and they may be obligated to make partial or deferred payments as money becomes available to them in the future"). Requiring Handsaker to pay for phone calls is a condition he "would be required to meet in the outside world." *See Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997) (citing several cases for support) (holding inmates did not establish valid Eighth or Fourteenth Amendment claim where medical fee was "modest" in nature and inmates did not demonstrate they needed "the funds in their prison accounts for essential expenses"); *see also Mosley v. Foti*, Civ. A. No. 85-5374, 1986 WL 11396, at *3 (E.D. La. Oct. 3, 1986) (citing *Dugar v. Coughlin*, 613 F. Supp. 849 (S.D.N.Y. 1985)) ("An inmate's right of access to the courts is not unconstitutionally infringed by reasonable charges for photocopying services."). In sum, although Handsaker asks this Court to conclude that TCCC's failure to provide him with free phone calls violates his constitutional rights, Handsaker has alleged no factual or legal basis supporting a finding that the failure to do so amounts to a cognizable constitutional claim. *See, e.g.*, *DeGrate v. Toney*, Civil Action No. 08–1943, 2009 WL 1309728, at *6 (W.D. La. May 11, 2009) (dismissing detainee's claim that he could not call family members because of the "excessive" cost of a phone call, where detainee did not allege that telephone access "was totally denied to . . . him" and "[e]ven indigent detainees [could] place collect calls at no expense to themselves").

### 2. *Freedom of speech*

Handsaker also makes the conclusory allegation that since his arrival at the TCCC in May 2019, Defendants have "threatened [him] with disciplinary action for exercising [his] 1st Amendment right . . . ." Questionnaire I 8. Handsaker, however, provides no specific facts supporting his claim—e.g., the type of speech he attempted to exercise, why he believes Defendants limited his speech, or whether the threat of disciplinary action in fact dissuaded him from speaking. *See id.* at 8–9. Because Handsaker's freedom of speech claim is wholly devoid of

13

factual information and conclusory, his claim cannot survive screening. The Court need not accept vague and non-specific allegations of wrongdoing, and such assertions are insufficient to support a § 1983 claim. *See Bohannan*, 527 F. App'x at 302 (holding that conclusory allegations provide an insufficient basis for § 1983 claims); *Richards v. Johnson*, 115 F. App'x 677, 678 (5th Cir. 2004) (same); *Lloyd v. Jones*, CASE NO. 9:18-CV-211, 2019 WL 4786874, at *6 (E.D. Tex. Sept. 10, 2019), *R. & R. adopted by* 2019 WL 4747850 (E.D. Tex. Sept. 27, 2019) (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010)) ("The Court does not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'").

For the foregoing reasons, the undersigned recommends that the District Judge dismiss Handsaker's freedom of speech claims.

E.    **Handsaker has failed to plead adequate facts demonstrating Defendants unconstitutionally denied him access to the courts.**

Handsaker contends that Amy Deleon Curtis denied him access to the courts on July 3, September 20, and November 18, 2019, when she failed to "call" him to the law library. Questionnaire I 7. In his Complaint, Handsaker also complains that he has been denied access to the courts because the law library computers are not up-to-date and do not have access to LexisNexis, a legal search engine. Compl. 1. Handsaker does not attribute any specific harm to the alleged denial of law library time or access to LexisNexis. *See* Questionnaire I 7–8.

To prevail on an access to courts claim, Handsaker must show that Curtis denied him access to the courts and that the denial caused him prejudice. *See Bohannan v. Griffin*, NO. 4:11-CV-299-A, 2016 WL 3647625, at *13 (N.D. Tex. June 30, 2016) (citing *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996)). That is, Handsaker must plead facts demonstrating "an actual injury arising from this purported denial." *Day v. Seiler*, 560 F. App'x 316, 319 (5th Cir. 2014) (citing *Lewis v.*

14

*Casey*, 518 U.S. 343, 356 (1996)).  Handsaker does not contend that (1) Curtis's alleged failure to

provide him with law library time on three occasions or (2) the lack of access to LexisNexis caused

him any harm—e.g., that he was unable to present a nonfrivolous legal claim or defense.  *See*

*Lewis*, 518 U.S. at 355.  The District Court should therefore dismiss his access to courts claim.

*See, e.g.*, *Day*, 560 F. App'x at 319 (affirming district court's dismissal of SVP's access to courts

claim where he did not allege the purported lack of access to courts caused him an actual injury);

*Bohannan*, 2016 WL 3647625, at *13 (dismissing SVP's access to courts claim where his

allegations did not demonstrate "he was denied the basic tools needed to present a nonfrivolous

legal claim or defense"); *Allen*, 2013 WL 357614, at *5 (dismissing SVP's claim that he lacked

access to a law library, where SVP failed to allege "that he suffered any actual injury").

F.    **Handsaker has not pleaded sufficient facts demonstrating Defendants retaliated against him in violation of the Constitution.**

Handsaker claims that every day since his arrival at the TCCC, Defendants have retaliated

against him "for speaking [his] opinion and try[ing] to resolve [unidentified] issues."  Compl. 1;

Questionnaire I 11.  Handsaker contends Defendants have retaliated by threatening:  "bodily

harm"; "to lock [him] in solitary confinement"; and "to never allow [him] to see [his] family" or

"have contact with them again."  Questionnaire I 11.  As a result of the alleged "retaliation,"

Handsaker avers he has suffered emotional distress and anguish.  *Id.*

To successfully assert a retaliation claim, civilly committed persons must show: "(1) a

specific constitutional right; (2) the defendant's intent to retaliate based on the exercise of that

right; (3) a retaliatory adverse act; and (4) causation."  *Bohannan*, 527 F. App'x at 299 (citing

*Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999) (per curiam)).  To state a retaliation

claim, a plaintiff "must allege more than his personal belief that he is the victim of retaliation,"

15

and conclusory "allegations of retaliation will not be enough" to support such a claim. *Jones*, 188 F.3d at 325. The plaintiff "must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Id.* (internal quotation marks omitted) (quoting *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Failure to "point to a specific constitutional right that has been violated" defeats the retaliation claim. *Id.*

Even assuming Handsaker could establish the first element—the exercise of a specific constitutional right—his retaliation claim fails because he has not demonstrated Defendants' intent to retaliate nor has he shown he suffered a retaliatory adverse act. To the contrary, Handsaker has pleaded no facts suggesting Defendants' motive at all, much less any facts indicating Defendants intended to retaliate against him. *See* Questionnaire I 11. Handsaker merely attaches the "retaliation" label to Defendants' purported conduct. *See Woods*, 60 F.3d at 1166 (holding that a plaintiff "must produce direct evidence of motivation" or "allege a chronology of events from which retaliation may plausibly be inferred"); *Jones*, 188 F.3d at 325 (holding that conclusory allegations or a personal belief are not sufficient to establish a retaliation claim).

Moreover, Handsaker has not shown that Defendants engaged in a retaliatory adverse act. He merely alleges that Defendants "threatened" to act against him. Such an assertion does not satisfy the third element. *See Hoffman v. Stulga*, 464 F. App'x 229, 232 (5th Cir. 2011) (explaining that prisoner's "claim of retaliation fails because he [did] not show that the defendants engaged in any retaliatory act beyond threats"); *Bell v. Woods*, 382 F. App'x 391, 393 (5th Cir. 2010) (holding that prisoner "ha[d] not stated a retaliation claim because he . . . alleged only a threat, but no retaliatory adverse act"). Thus, the District Judge should dismiss Handsaker's retaliation claim.

16

G.     **Handsaker's alleged placement in solitary confinement does not give rise to a cognizable constitutional claim.**

Handsaker asserts that between May 8 (the day he arrived at TCCC) and 11, 2019, Captain Demel placed him in "solitary confinement." Compl. 1; Questionnaire I 12. The placement, Handsaker contends, constituted "false imprisonment" and caused him to get "inadequate sleep, and treatment." Questionnaire I 12. The Court liberally construes Handsaker's pleadings as alleging that Captain Demel's actions violated his substantive due process rights under the Fourteenth Amendment.

As a civilly committed person, Handsaker is entitled to "more considerate treatment and conditions of confinement" than a prison inmate. *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Because Handsaker "has been civilly committed to state custody as a [sexually violent predator]," however, "his liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224–26 (2005) and *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) (stating that officials "enjoy wide latitude in developing treatment regimens [for SVPs]"); *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (citations omitted) (noting that "the Constitution . . . affords a state wide latitude in crafting a civil commitment scheme" because "the state legislatures not only are equipped, but also possess the democratic mandate, to make difficult policy choices regarding the supervision and treatment of sexually violent predators"). Ultimately, "[d]ue process requires only that 'the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed.'" *Brown*, 911 F.3d at 243 (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)).

As the Fifth Circuit observed in *Brown v. Taylor*, Texas maintains "twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Id.* (quoting Tex. Health & Safety Code Ann. § 841.001 (West 2017)). Although Handsaker alleges that he was briefly separated "from the community" upon his arrival (Questionnaire I 13), he has not sufficiently pleaded facts demonstrating that his temporary placement in solitary upon his arrival at TCCC (1) lacked a reasonable relation to Texas's twin goals or (2) did not bear some reasonable relation to the purpose for which he was committed. *Brown*, 911 F.3d at 243 (observing that even where restrictive conditions result in similar treatment between civilly committed SVPs and prisoners, plaintiff failed to allege valid due process claim where he did not "sufficiently allege[] how the conditions . . . lacked a reasonable relation to Texas's twin goals of 'long-term supervision and treatment'" of SVPs). Moreover, the denial of certain privileges—ability to interact with his peers for three days—amounts to *de minimis* restrictions, of which "the Constitution is not concerned." *See Senty-Haugen*, 462 F.3d at 886 n.7 (quoting *Bell*, 441 U.S. at 539 n.20) (explaining that SVP's contention that placement in isolation deprived him of access to the canteen, outside vendors, and computer privileges amounted to *de minimis* restrictions of his liberty). The undersigned finds that Handsaker has not stated a substantive due process claim based on his placement in solitary for three days upon his arrival at the facility. Accordingly, the District Judge should dismiss his claim.

### H.    Handsaker has not pleaded sufficient facts demonstrating Defendants acted with deliberate indifference to a serious medical need.

Handsaker alleges that Defendants failed to provide him with "the proper medication for [his] sleep apnea/narcolepsie [sic], PTSD anxiety, ADHD, and . . . [plaque psoriasis]." Questionnaire I 9. Handsaker concedes that TCCC medical staff examined him on June 10,

18

September 18, and October 18, 2019, but he indicates that on those dates, Defendants did not provide him the "proper medication." *Id.* He further acknowledges that medical staff *did in fact* "respond[]" (presumably in writing) *to his medical requests* on June 24, September 25, and October 19, 2019. *Id.* Handsaker nevertheless avers that Defendants' purported failure to prescribe him the proper medication for his conditions has caused him emotional and mental anguish and distress. *Id.* at 9–10.

As a civilly committed person, Handsaker's right to reasonably adequate medical care derives from the Eighth Amendment. *See, e.g.*, *Bohannan*, 527 F. App'x at 291–92 (applying the Eighth Amendment deliberate indifference standard to an SVP's claim of inadequate medical care). A plaintiff seeking to establish an Eighth Amendment violation in regard to medical care must allege facts showing that officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (emphasis in original)). Deliberate indifference "is an extremely high standard to meet." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotations omitted).

In this case, Handsaker does not assert that Defendants denied him all medical treatment— he just disagrees with the type of treatment or medication they are providing. *See* Questionnaire I 9–10. A disagreement over treatment does not give rise to a claim for deliberate indifference. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Moreover, Handsaker does not specify what injury he has suffered, other than mental and emotional anguish. Questionnaire I 10. Handsaker's allegations, even liberally construed, fall far short of demonstrating the "unnecessary

19

or wanton infliction of pain or injury required to state a cognizable claim for deliberate indifference." *Bohannan*, 527 F. App'x at 297 (affirming dismissal of SVP's Eighth Amendment claim where he "merely alleged a failure to provide court-ordered mental health treatment" and did "not state what treatment was denied or what injury he has suffered"). Thus, the undersigned recommends that the District Judge dismiss Handsaker's claim based on alleged inadequate treatment.

I.    **Handsaker's conclusory claims based on a denial of the right to practice his religion should be dismissed.**

Handsaker generally alleges that Defendants have denied him the right to practice his Native American religion. Compl. 1; Questionnaire I 5. According to Handsaker, the TCCC does not recognize the Native American religion. Questionnaire I 6. He asserts that he would like to be able to "partake in the pipe ceremony, the sweat lodge ceremony, the medicine wheel ceremony, fasting ceremonies, [and] vision quest ceremonies." *Id.* Handsaker claims that when he asked to practice these ceremonies, however, Defendants responded that it would constitute a breach of security and was "to[o] costly to get a Native American chaplain." Questionnaire 2, ECF No. 17 [hereinafter Questionnaire II].[4] Handsaker also states, however, that Defendants advised he "could obtain the religious items, and materials that [he] need[s] to practice [his] religion." Questionnaire I 6. Specifically, in his supplemental questionnaire responses, Handsaker attached a grievance dated March 14, 2020, reflecting that TCCC officials had approved "Crazy Crow Trading Post American Indian" as a vendor through which Handsaker can purchase religious items. Questionnaire II 18. Handsaker acknowledges that he is permitted to keep religious items in his room. *Id.* at 3.

---

[4] Page citations to Handsaker's supplemental questionnaire responses (ECF No. 17) refer to the electronic page number assigned by the court's electronic filing system.

In the supplemental questionnaire, the Court specifically asked Handsaker to correlate each alleged unconstitutional act, and corresponding date, with each Defendant named in his initial questionnaire responses. *See* Questionnaire II 4–6. With respect to the Defendants identified— Aaron Pierce, Cris Salinas, Rachel Kingston, J. Cochran, W. Schmoker, and Greg Shirley— Handsaker asserts the same claim: "Starting in July I started pushing the issue of being abule [sic] to get the Garden and a room for the Native Americans that are here and would like to partake in [our] practice[.] I have been give[n] the run around [sic] up to date." *Id.* at 4. Despite generally alleging that Defendants have not permitted him to partake in certain activities such as the pipe and medicine wheel ceremonies, Handsaker does not attribute that denial to any specific Defendant. Handsaker's factual assertions fail to state a viable claim for relief.

First, Handsaker states that Defendants have not permitted him to engage in ceremonial activities such as the pipe ceremony due to security and cost reasons. As alleged, these considerations are rationally related to legitimate institutional interests. *See generally Chance v. Tex. Dep't of Criminal Justice*, 730 F.3d 404, 412 (5th Cir. 2013) (providing that Texas Department of Criminal Justice's "duty to protect the health and safety of its prisoner population is indisputably an interest of the highest order" and further noting that "the standard prison practice of providing for the generic tenets of major faith groups is not only reasonable, but necessary in light of the prison's limited resources"); *Inzunza v. Moore*, No. 2:09–CV–0048, 2011 WL 1211434, at *13 (N.D. Tex. Mar. 31, 2011) (reasoning that prisoner, a member of the House of Yahweh which constituted 0.4% of the prison population, had failed to state a viable First Amendment claim where prisoner could attend worship services (though not exclusive to his religion), pray and discuss his religion with other inmates, and possess religious materials in his cell). Handsaker's claim, however, is subject to dismissal for a more fundamental reason—he

21

acknowledges that TCCC allows him to acquire and keep religious materials, and he does not aver that Defendants have prevented him from worshipping in his room or with other religious groups. *See* Questionnaire II 3, 18; *Baranowski v. Hart*, 486 F.3d 112, 121 (5th Cir. 2007) (noting that despite being denied weekly Sabbath services, Jewish prisoner "retain[ed] the ability to participate in alternative means of exercising his religious beliefs, including the ability to worship in his cell using religious materials . . ."). Such accommodations satisfy constitutional concerns—"[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004).

Even if the Court concluded Handsaker had stated a cognizable First Amendment claim, however, it would nevertheless recommend dismissal because he fails to attribute any of the purported constitutional violations to a specific Defendant nor does he specify when the discrete acts occurred. The only specific acts Handsaker attributes to each Defendant is the inability to grow a garden with certain herbs and provision of a room for worship.[5] Questionnaire II 4–6. Handsaker does not ascribe the remaining conduct—that on unspecified dates, unknown persons violated his First Amendment rights by denying him the ability to "partake in the pipe ceremony,

---

[5] These two alleged deprivations do not give rise to a viable constitutional claim. First, the grievances Handsaker attached to his supplemental questionnaire responses reflect that TCCC officials did not deny outright permission to grow a garden with herbs important to the Native American religion but instead inquired into when the plants should be grown and who would supply/fund the plants. Questionnaire II 9. TCCC official D. Bowers (who Handsaker does not allege violated his First Amendment rights) specifically explained that the garden would "require a lot of discussion before any changes [were] made." Moreover, Handsaker does not plead any facts indicating how the alleged denial of a garden prevents him from practicing his religion. Similarly, Handsaker does not specify how the denial of a designated room violated his First Amendment rights. As pleaded, Handsaker fails to state a claim against the named Defendants. *See, e.g.*, *Chance*, 730 F.3d at 412; *Inzunza*, 2011 WL 1211434, at \*13. Thus, Handsaker's First Amendment claim should be dismissed against the named Defendants: Aaron Pierce, Cris Salinas, Rachel Kingston, J. Cochran, W. Schmoker, and Greg Shirley.

the sweat lodge ceremony, the medicine wheel ceremony, fasting ceremonies, [and] vision quest ceremonies"—to any specific person. Questionnaire I 5; Questionnaire II 1–6.

Handsaker's Complaint is wholly devoid of the specific information required by Federal Rule of Civil Procedure 8—e.g., the who, what, where, when, why, and how. *See* Compl. 1 (alleging that he has "been denied the right to practice [his] Religion Freely and Fully" but failing to name any defendant or provide specific facts supporting his claim). The Court provided Handsaker multiple opportunities, through two separate questionnaires, to supply sufficient factual detail in support of his claims; nevertheless, despite several chances to plead his best case, Handsaker has not charged any specific individual(s) with committing unconstitutional acts. Stated differently, Handsaker lumps Defendants together as a group, generally alleging that they prevented him from practicing his religion. *See* Questionnaire I 5–6; Questionnaire II 1–6. Handsaker's lack of specificity prevents the Court from discerning which Defendant(s) allegedly committed the claimed unconstitutional acts. *See, e.g.*, *Ned v. Eunice Police Dep't*, Civil Action No. 6:16-CV-1035, 2016 WL 7976132, at *5 (W.D. La. Dec. 14, 2016), *R. & R. adopted by* 2017 WL 369128 (W.D. La. Jan. 23, 2017) (dismissing plaintiff's Eighth Amendment claim because the complaint was "devoid of any specific facts or allegations that any named defendant violated [p]laintiff's Eighth Amendment rights"); *Williams v. Harrison*, Civil Action No. 3:11–cv–1880, 2012 WL 601453, at *3 (W.D. La. Jan. 19, 2012), *R. & R. adopted by* 2012 WL 601475 (W.D. La. Feb. 22, 2012) (noting that "[n]othing in plaintiff's complaint suggest[ed] that the specific defendants . . . were guilty of deliberate indifference").

For all of these reasons, the Court recommends dismissal of Handsaker's First Amendment claim.

23

J.     **Handsaker cannot state a viable constitutional claim based on purported verbal harassment.**

In his Complaint, Handsaker conclusorily asserts that unnamed persons have harassed him "verbally, sexually, and emotionally." Compl. 1. Handsaker does not provide any factual details or explain how such acts violated his constitutional rights.

The Fifth Circuit has long recognized that verbal threats or harassment made by a correctional officer do not constitute a basis for a § 1983 claim. *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143 (5th Cir. 1983)); *see Rader v. Lubbock Cty.*, No. Civ. A. 5:01-CV-258-C, 2003 WL 21145788, at *13 (N.D. Tex. Apr. 25, 2003) (quoting *Robertson*, 70 F.3d at 24) (dismissing prisoner's claim that defendant verbally taunted and threatened him because "mere threatening language and gestures of a custodial office[r] do not, even if true, amount to constitutional violations"). Verbal threats, abusive language, or other harassment, "while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." *Johns v. Miller*, No. CIV.A. 05-2489, 2005 WL 3592248, at *7 (E.D. La. Oct. 26, 2005) (citing *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993), *aff'd*, 23 F.3d 410 (7th Cir. 1994)); *see also Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (holding that a sheriff's threat to hang a prisoner did not constitute an actionable claim under § 1983). Similarly, "[v]erbal sexual harassment does not violate a detainee or inmate's constitutional rights . . . ." *Jane Doe 5 v. City of Haltom City*, 106 F. App'x 906, 908 (5th Cir. 2004). Thus, the District Judge should dismiss Handsaker's claim.

## IV.    <u>Recommendation</u>

For the foregoing reasons, the undersigned recommends that the United States District Court dismiss Handsaker's Complaint and all claims therein with prejudice in accordance with 28 U.S.C. § 1915(e)(2)(B).

## V.    <u>Right to Object</u>

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2017); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: May 12, 2020

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE

25